**YELLOW CAB COMPANY OF ALAMEDA COUNTY, a corporation,**
Plaintiff,

v.

**The UNITED STATES of America,**
Defendant (two cases).

**YELLOW CAB CO., a corporation,**
Plaintiff,

v.

**The UNITED STATES of America,**
Defendant (two cases).

Nos. 34227, 34228, 34506, 34507.

United States District Court
N. D. California, S. D.
June 29, 1956.

Chauncey McKeever, San Francisco, Cal., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe, Rufus E. Stetson, Jr., Washington, D. C., Lloyd H. Burke, U. S. Atty., Lynn J. Gillard, Asst. U. S. Atty., San Francisco, Cal., for defendant.

GOODMAN, District Judge.

Plaintiff seeks the refund of the telephone service sales tax assessed and collected from it pursuant to Section 3465 of the Internal Revenue Code of 1939, 26 U.S.C. § 3465, during the period June 16, 1946, to March 21, 1954, on the amount it paid for certain telephone service utilized in the conduct of its business as a common carrier.

The telephone service on which the tax was levied was that furnished to plaintiff by the Pacific Telephone and Telegraph Co. between plaintiff's headquarters and plaintiff's numerous taxi stands throughout the metropolitan area of San Francisco and Alameda counties. The service was provided by means of private lines running from plaintiff's headquarters to the taxi stands. The majority of the taxi stands were equipped with a telephone with a bell and a device by which a cab driver could signal plaintiff's headquarters that the stand was occupied. The operators at the switchboard in plaintiff's headquarters could thus relay requests for taxi service received through the local public telephone service to any occupied stand. When the stand was unoccupied, the telephone there could be used by patrons to request taxi service. The equipment differed slightly at stands located at such places as hotels and depots where the demand for service was great and it was unlikely that the stand would remain occupied for any length of time. Such stands were equipped merely with a telephone without a bell which could be used by patrons or by starters stationed at the stand to request service.

It was not possible to utilize the telephones at the taxi stands to make a direct call through the local public telephone system, nor could a call be made through the local telephone system directly to a stand telephone. However, it was physically possible for the operators at the switchboard in plaintiff's headquarters to connect a call from one of the stand telephones to any telephone in the public system if the operator first dialed the required number. It was also possible for the operators to connect a call from a telephone in the public system to a line running to a stand telephone. It was testified at the trial that connections were never made between the stand telephones and the public system, except perhaps when requested by a police officer in an emergency. Defendant presented no evidence to the contrary.

The sole issue to be resolved is whether this telephone service is the type of service characterized in Section 3465 of the Internal Revenue Code of 1939 as "talking circuit special service." If it is, plaintiff is entitled to the refund sought since Section 3465 specially exempted

common carriers from paying the telephone service sales tax on amounts paid for "talking circuit special service" utilized in the conduct of their business.

Assistance in determining the meaning of the term "talking circuit special service" is afforded by the history of the federal sales tax on telephone service. The first instance of such a tax was during the Spanish American War, when a tax of one cent was imposed on each telephone call for which a charge of 15 cents or more was made. 30 Stat. 460. A similar tax was again imposed as a war emergency measure in 1914, 38 Stat. 761, and in 1917 the tax was increased to five cents for each call, 40 Stat. 315. The Revenue Act of 1918 again increased the tax on toll calls and imposed a new tax of 10% on the amount paid for leased wire or talking circuit special service, 40 Stat. 1102. This tax was continued by the Revenue Act of 1921. 42 Stat. 284. Both Acts exempt common carriers from paying the tax on leased wire or talking circuit special service.

Treasury Regulation 57 issued pursuant to the 1918 and 1921 Revenue Acts provided that: "Leased wire special service includes exclusive leases of wires and also contracts by which the carrier agrees to furnish a circuit (that is, a wire or wires, instruments and electrical energy) for the transmission of messages in Morse characters or by spoken word between specified points or offices during specified hours. Operators may or may not be employees of the carrier. * * * Talking circuit special service is a limited class of leased wire special service and refers to such service where the transmission is telephonic. Such a talking circuit may by contract have one terminal at a switchboard of the carrier, allowing connection with any telephone within the local exchange area of the operating station. Such additional exchange and other incidental service is included in the term 'talking circuit special service'."

Apparently the Treasury Department felt that the Congress intended the leased wire tax to be the equivalent, in respect to service afforded via private lines, of the toll call tax which applied to calls via the public telephone system. For, Treasury Regulation 57 also provided that: "For administrative purposes it is held that where the area covered by a leased wire special service is served by a local telephone exchange, tolls not being charged upon messages transmitted between points within such area, such special service does not come within the provisions of the act."

All federal taxes on telephone service were abolished by the Revenue Act of 1924, 43 Stat. 352. In 1932, both the tax on toll calls and the tax on leased wire or talking circuit special service were reinstituted, the latter at the rate of 5%, 47 Stat. 270. Common carriers were again exempted from the tax on leased wire or talking circuit special service utilized in the conduct of their business. Treasury Regulation 42 issued pursuant to the 1932 Act was substantially the same as former Regulation 57 in so far as it defined the term "leased wire or talking circuit special service." The tax on telephone service as imposed by the Revenue Act of 1932 was carried into the Internal Revenue Code of 1939, 53 Stat. Part I, 26 U.S.C. § 3465.

The Revenue Act of 1941 amended the Internal Revenue Code to impose, for the first time, a tax on the amount paid by subscribers for local telephone service at a rate of 6%, 55 Stat. 714, 26 U.S.C. § 3465(a) (3). The 1941 Act also increased the tax on leased wire or talking circuit special service to 10% and, in view of the new tax on local telephone service, specially provided, that the tax on leased wire or talking circuit special service should thereafter apply whether or not the wire or service was within a local exchange area. The Revenue Act of 1942 increased the tax on local telephone service from 6% to 10% and the tax on leased wire or talking circuit special service from 10% to 15%, 56 Stat. 976, 26 U.S.C. § 3465. The Revenue Act of 1943 increased the tax on local telephone service to 15% and on leased wire or talking circuit special service to 25%, 58

Stat. 61, 26 U.S.C. § 1650. These rates remained in effect during the period June 19, 1946 to March 21, 1954 when the tax sought to be recovered was assessed against plaintiff.[1]

Treasury Regulation 42 as it read during this same period stated that: "In general, leased wire, teletypewriter, or talking circuit special service relates to private line service where channels, equipment and other facilities are furnished (usually, but not necessarily, on a contractual basis) to enable users to communicate between specified locations continuously or for specified periods, as distinguished from the sending of single dispatches, messages, and conversations by telephone, radio telephone, telegraph, cable, or radio for which tolls are charged by the carrier. The communications may be telephonic, in Morse or similar code, or may be reproduced at the terminating end in the form of a typewritten page or tape, or picture or facsimile. The charge for such service may be on a monthly, daily, or hourly basis, or may be determined by the time consumed in transmission, or by the number of words or characters transmitted. In certain instances it may be necessary to utilize the switchboards and exchanges of a carrier to connect the sending and receiving terminals of the service. Examples of such service are, (1) channels and equipment for private telephone service, (2) channels and equipment for private Morse or similar code service, (3) channels and equipment for teletypewriter or teleprinter service, (4) channels and equipment for teletypewriter or teleprinter exchange service, (5) channels and equipment for program transmission, and (6) channels and equipment for photograph, picture or facsimile transmission." 26 C.F.R. § 130.38.

Treasury Regulation 42 further provided that "The term 'local telephone service' relates generally to the ordinary residential or business or commercial telephone service within a local exchange area and includes all types of such service, such as individual line and party line telephones and extension telephones." 26 C.F.R. § 130.40.

The distinctive feature of talking circuit special service as revealed in this series of statutes and regulations is the exclusiveness of the facilities afforded for telephonic communication between two points. This feature was inherent in the system connecting plaintiff's headquarters with the taxi stands; it was available at all times for the exclusive use of plaintiff and its patrons. The Government contends that this system lost its character as a talking circuit special service merely because it was physically possible to connect a line running from a stand telephone with the local public telephone system. This argument is entirely lacking in merit.

The type of equipment employed in the system connecting plaintiff's headquarters and the taxi stands is indicative that the system was designed and intended to afford a private telephone service entirely separate and apart from the local telephone service. The testimony at the trial that connections were not made with the public telephone system except in cases of emergency merely confirms the obvious fact that practical and useful operation of plaintiff's system would not permit more than an occasional connection with the public system. The value of the system to plaintiff lay in the fact that it continuously provided clear and exclusive channels for transmitting requests for taxi service.

The physical arrangement permitting connection of the stand line system with the local public telephone system was not the result of any design that plaintiff should utilize the stand line system to avail itself of local telephone service. This arrangement existed only because plaintiff subscribed to both types of service. Both systems, as a matter of operating conveniences, terminated at a common switchboard at plaintiff's headquarters. The physical possibility of or even actual connection between the stand line

---

1. The Act of March 31, 1954, reduced the tax on all types of telephone service. 68 Stat. 41.

system and the local public system did not make the stand line system a mere adjunct of the public system. That plaintiff had and used *both* systems did not thereby change the *actual* character of either.

The conclusion is inescapable that the telephone service connecting plaintiff's headquarters and its taxi stands was a talking circuit special service, and that plaintiff is entitled to the refund sought. Additional support for this conclusion is found in the case of Yellow Cab Co. of Cleveland v. Carey, D.C., 141 F.Supp. 379, in which Judge Jones of the Northern District of Ohio reached the same result upon almost identical facts.

Judgment for plaintiff as prayed in all causes, upon Findings to be presented in accordance with the Rules.